
# IN THE SUPREME COURT OF GUAM

## PEOPLE OF GUAM,
Plaintiff-Appellee,

**v.**

## VINCENT RODRIGUEZ CEPEDA,
Defendant-Appellant.

Supreme Court Case No.: CRA19-014
Superior Court Case No.: CF0064-19

## OPINION

## Cite as: 2021 Guam 9

Appeal from the Superior Court of Guam
Argued and submitted on December 3, 2020
Via Zoom video conference

Appearing for Defendant-Appellant:
Peter C. Perez, *Esq.*
Law Office of Peter C. Perez
DNA Bldg.
238 Archbishop Flores St., Ste. 802
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Christine Santos Tenorio, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 801
Tamuning, GU 96913


E-Received
8/26/2021 9:30:50 AM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, JR., Associate Justice; KATHERINE A. MARAMAN, Associate Justice.

**TORRES, J.:**

[1]      Defendant-Appellant Vincent Rodriguez Cepeda appeals his conviction of Second Degree Robbery (As a Second Degree Felony), with a Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony, and Theft of Property (As a Misdemeanor).  Cepeda contests the convictions on the grounds of insufficient evidence; due process and Confrontation Clause violations; inappropriate admission of hearsay evidence; and prosecutorial misconduct. For the reasons below, we affirm the judgment of conviction.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]      Cepeda was arrested and a Superseding Indictment was filed charging him with four counts: (1) Second Degree Robbery (As a Second Degree Felony), in violation of 9 GCA § 40.20(a)(3) (2005), with a Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony, in violation of 9 GCA § 80.37; (2) Third Degree Robbery (As a Third Degree Felony), in violation of 9 GCA § 40.30(a)(1) and (b), with a Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony, in violation of 9 GCA § 80.37; (3) Possession of a Schedule II Controlled Substance (As a Third Degree Felony), in violation of 9 GCA § 67.401.2(a) and (b)(1); and (4) Theft (As a Misdemeanor), in violation of 9 GCA §§ 43.30(a) and 43.20(c).

[3]      During trial, the prosecution moved without objection to dismiss the third charge, Possession of a Schedule II Controlled Substance (As a Third Degree Felony), which the trial court granted.  At the close of the People's case, the defense moved for judgment of acquittal on the

remaining charges; the trial court granted the motion as to the second charge, Third Degree Robbery (As a Third Degree Felony), but denied it as to the first and fourth charges.

[4]      The People called three civilian witnesses and four police officers to testify about the events that occurred.  Nolan Nunez testified that he was driving with his wife in Hagåtña when he observed a male later identified as Cepeda "running away from two women of Asian descent." Transcript ("Tr.") at 11 (Jury Trial, May 13, 2019).  Nunez noticed Cepeda was running in "zigzags," which he thought was abnormal.  *Id.*  Nunez followed Cepeda and witnessed the defendant turn a corner and enter "a bushy area" near a coffee shop and behind a church.  *Id.* at 12.  Nunez called the police, and when Cepeda came out from the bushy area, Nunez noticed that Cepeda had "an old, rusty machete" that was "[p]robably 12 to 15 inches in length."  *Id.* at 12–14. Nunez stated that the police arrived within minutes and he "stayed back until [the police] apprehended [Cepeda]."  *Id.*

[5]      Nunez described the two individuals he characterized as the victims to be "a younger lady, and . . . an older lady" of "Asian descent" who were "panicking, screaming" when he got to them. *Id.* at 15–16.  Nunez testified that "the older lady had fallen in the intersection" and that he escorted the women to the police station by asking them to follow him in their own car.  *Id.* at 16–17.  On cross-examination, Nunez noted that he lost sight of Cepeda a few times during the incident, including when he ran into "the jungle next to the coffee shop," and that when he gave his initial report to the police, he did not mention Cepeda carrying anything but the machete.  *Id.* at 17–18.

[6]      The People then called Leilani Mesa-Tenorio, who testified that she was driving in Hagåtña with her husband and mother when she witnessed "a man running with a woman's bags.  And the woman was screaming from her car."  *Id.* at 24–25.  Mesa-Tenorio testified that she saw two women, one older and the other younger, screaming.  She then said that she, her husband, and her

mother chased the running man in their car until they saw the man stop "near the jungle near Port of Mocha." *Id.* at 26. Mesa-Tenorio testified that another couple was also chasing the man in another vehicle and that she had called the police. She stated she did not lose sight of the man at any point "because [they] saw him in the jungle" and "were just waiting to see his next move." *Id.* She further testified that she saw the man with what she described as the women's belongings, "[a] white and purple bag" that he appeared to have dumped in the jungle, and "that he had a machete when he went into the jungle." *Id.* at 27. She later clarified that "[i]t was only after he was running into the jungle, away from the police, that [she] noticed the machete." *Id.* at 28. She estimated that the man was within twenty feet of her during the events described, and the man she saw "could be the defendant. It's been a while. He was wearing a beanie." *Id.* On cross-examination, Mesa-Tenorio clarified that she did lose sight of the man when he was in the jungle, and on redirect, she clarified that she did have her own independent recollection of the events based on what she saw despite her testimony she and her husband had prepared a written statement to the police together.

[7]     The third civilian witness called by the People was Perpetua San Agustin, who testified that she drove to the police station to report that, while stopped at a traffic light, she witnessed "a man running with a machete in his hand and two tourists who looked like they were in distress." *Id.* at 37. She described the man as approximately 5'7", Chamorro, "wearing a gray shirt, cargo pants," with a "buzz cut" and "running with a giant machete." *Id.* at 37–38. She described the two tourists as "Korean tourists, an older, senior woman, maybe roughly sixty-ish, and then what [she] believed to be her daughter, maybe like in her late thirties or early forties" who "looked like they were in significant distress . . . yelling after the man." *Id.* San Agustin testified that she saw the man from about ten to fifteen feet away and identified him as the defendant in the courtroom.

*Id.* at 39. She further testified that when she observed him running, "he was clutching the machete in his right hand and clutching a bag, which was roughly purple and white, to his chest." *Id.*

[8]     Before the testimony of the police officers, the defense raised the issue of confrontation in relation to ownership of the recovered property. The defense argued that the officers should not be allowed to testify about any statements made by the victim or about any "nonverbal conduct" which might be interpreted to acknowledge ownership. Tr. at 3–4 (Jury Trial, May 14, 2019). The People opposed, arguing "[the victims] taking their items back, that's not testimonial." *Id.* at 4. The defense conceded that "if they decide to put the officer on and say that he gave it back to these people, to the two ladies, and he gave the passport back to the lady that looked like she was in the passport, that's not a confrontation issue." *Id.* at 10. The trial court allowed the testimony of three of the police officers to go forward but requested briefing on the confrontation issue relating to ownership of the items before the testimony of the officer who relinquished the items, Officer Roy Lujan.

[9]     The People ultimately called four of the five officers who responded to the call and were involved in the arrest: Officer Anthony Gumataotao, Officer Bryan Benavente, Sergeant Roy Henricksen, and Officer Roy Lujan. A fifth officer, Officer Julius Tibay, was also present at the scene and reportedly found some of the items while canvassing the area but did not testify. The two officers whose testimony is most relevant on appeal are Officer Benavente and Officer Lujan.

[10]     Officer Benavente testified that he responded to a call about a robbery and observed Cepeda "carrying bags in his left hand and a machete in his right hand." *Id.* at 39. After the officers pursued Cepeda on foot and Sergeant Henricksen tased Cepeda, Officer Benavente noticed "[Cepeda] had several belongings on him, next to him on the ground. One of them was the machete and the other was a like purple-white bag. And then he was trapped with a black pouch, also, on

his waist." *Id.* at 39–40. Officer Benavente testified that upon collecting the items and taking inventory of them, he noted that "[t]he black pouch contained several items that had identification belonging to Mr. Cepeda," including his Guam identification card. *Id.* at 42–43.

[11]    Officer Roy Lujan testified that he was present when the defendant was apprehended with a machete and a bag in his possession. He also testified that "[p]ersonal belongings to the victim" were also discovered around the defendant including "a purse and some personal belongings that the victim owned." *Id.* at 54. He testified that the victim's passport, identified as Exhibit 10F during trial, "was found within the facility [sic] that we were chasing Mr. Cepeda at. . . . [B]y the Legislature Building." *Id.* at 55–56. Defense requested a sidebar to contest Officer Lujan's personal knowledge, after which the trial court requested the prosecutor rephrase his questioning. Officer Lujan further testified that the physical evidence was "confiscated" and later "relinquished back to the owners." *Id.* at 60.

[12]    After authentication by Officer Lujan, the People moved into evidence the photographs of the victim's I.D., Korean and U.S. currency, passport, purse, and wallet without objection from the defense. The photographs included depictions of two U.S. $100 bills, two U.S. $50 bills, one U.S. $20 bill, and one U.S. $10 bill. While authenticating the exhibits, Officer Lujan identified the purse as "the victim's bag" and "a passport and the wallet and an I.D. . . . [t]hat was property that was taken from the victim," also without objection from the defense. *Id.* at 63. Various additional comments relating to the ownership of the items were made by Officer Lujan without objection from defense counsel, e.g., "the victim's wallet and phone cases and pouch," and "victim's passport." *Id.* at 66–67. Officer Lujan confirmed that the items depicted in the photographic exhibits were "relinquished back to the victim . . . the same person that's in that passport." *Id.*

**[13]** On cross-examination, Officer Lujan acknowledged that the property receipt, which was identified as Exhibit 8A, showed that all the items depicted were seized at 210 Archbishop Flores Street, while Cepeda was seized elsewhere, near the Legislature Building. He further confirmed that he did not locate these items but rather Officer Tibay did, that Officer Lujan "came into contact with the items and the photographs once they were in the police station," and that he was not "involved with collecting them at all." *Id.* at 68, 71–72.

**[14]** During closing arguments, the defense objected to various comments made by the prosecution. First, the defense objected in a sidebar to the themes of community and tourism espoused by the prosecution on the grounds of prejudice to Cepeda. After continued discussion, the trial court asked the prosecution to "move on." Tr. at 11–14 (Jury Trial, May 20, 2019). Yet when counsel returned from sidebar, the prosecution started again with "Our sense of community. What this case does, ladies and gentlemen, is shows the very best of our community," to which the defense again objected, prompting the court to ask the prosecution once again to move on. *Id.* at 14–15. Soon after, the prosecution mentioned tourism and community a third time when counsel said, "Two tourists in desperate need of assistance. And then in contrast to the best of our community, consider what the tourist experienced," to which defense again objected and the court sustained. *Id.* at 16–17.

**[15]** After returning from sidebar, the defense objected to the prosecution's subsequent statement asking the jury to "[c]onsider what these two Asian women experienced," arguing it was too close to the tourism issue, after which the court asked the prosecution not to say "tourist" or "Asian." *Id.* at 17–18. The prosecution continued, stating that Cepeda "left this elderly woman . . . stranded without her passport . . . in a foreign country without her money [and] there was no evidence of an apology." *Id.* at 18–19. Defense objected once again, arguing that the prosecution's

comments suggested that the defense had the obligation to produce missing evidence about Cepeda's conduct and that Cepeda had an obligation to apologize because he was guilty. The trial court asked the prosecution to rephrase, and he continued by stating Cepeda does not have to testify but no eyewitnesses had testified about an apology from him or about Cepeda checking on these tourists.

[16]    The prosecution then summarized the testimony heard and the evidence admitted, including that Officer Lujan while at the precinct "saw that the victim's property, which was [a] purple and white bag, victim's passports [sic], victim's currency, that these items were relinquished back to the victim . . . the same lady who's depicted in the passport." *Id.* at 24. After showing the jury the photograph exhibits, the prosecution described what appeared to be depicted in each photo, including that "People's Exhibit 10G appears to be a blown up photo of the passport . . . that the passport indicates that the owner . . . [is] Keumja Yoon." *Id.* at 24–26.

[17]    In its closing, the defense raised the lack of testimony from the victim and reminded the jury of the instruction that "[i]f weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory evidence was within the power of the party, the evidence offered should be viewed with distrust." *Id.* at 39. In its rebuttal, the prosecution discussed the lack of evidence on the availability of the victim.

[18]    The jury returned guilty verdicts against Cepeda on the first charge of Second Degree Robbery, with the Special Allegation, and the fourth charge of Theft (As a Misdemeanor). Cepeda was sentenced to eight years of imprisonment for the first charge, five years for the Special Allegation, and one year for the fourth charge to be served concurrently with the first charge, for a total of thirteen years with credit for time served.

## II. JURISDICTION

[19]    This court has jurisdiction over an appeal from a final judgment of conviction of the Superior Court under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-36 (2021)), 7 GCA §§ 3107 and 3108(a) (2005), and 8 GCA § 130.15(a) (2005).

## III. STANDARD OF REVIEW

### A. Sufficiency of the Evidence

[20]    "Where a defendant has raised the issue of sufficiency of the evidence by a motion for judgment of acquittal, we review the trial court's denial of the motion *de novo*." *People v. Erwin*, 2019 Guam 20 ¶ 11 (quoting *People v. Martin*, 2018 Guam 7 ¶ 8). "When reviewing the sufficiency of the evidence to support a conviction, this [c]ourt must determine 'whether the evidence in the record could reasonably support a finding of guilt beyond a reasonable doubt.'" *People v. Tenorio*, 2007 Guam 19 ¶ 9 (quoting *People v. Sangalang*, 2001 Guam 18 ¶ 20). This is a highly deferential standard of review, as we must view "the evidence in the light most favorable to the prosecution to ascertain whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sangalang*, 2001 Guam 18 ¶ 20). Under this review, the guilty verdict "removes the presumption of innocence to which a defendant had formerly been entitled and replaces it with a presumption of guilt." *People v. George*, 2012 Guam 22 ¶ 50 (per curiam).

### B. Confrontation Clause

[21]    We review evidentiary rulings implicating constitutional rights, including the right to confront witnesses, *de novo*. *People v. Diego*, 2013 Guam 15 ¶ 8. "A violation of a defendant's confrontation rights requires reversal unless, 'assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was

harmless beyond a reasonable doubt.'" *People v. Kotto*, 2020 Guam 4 ¶ 14 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)); *see also People v. Callahan*, 2018 Guam 17 ¶ 26 n.2.

## C.  Admission of Evidence Over Hearsay Objections

**[22]**     We review for abuse of discretion objected-to evidentiary rulings that do not implicate constitutional rights.  *See People v. Chinel*, 2013 Guam 24 ¶ 18.  An abuse of discretion is "that 'exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found.'"  *People v. Evaristo*, 1999 Guam 22 ¶ 6 (quoting *People v. Quinata*, 1999 Guam 6 ¶ 17).  If an abuse of discretion is found, we apply the harmless error standard to evaluate whether reversal is required.  *People v. Pugh*, 2018 Guam 14 ¶ 16.  Because defense counsel objected to the admission of Officer Lujan's testimony on hearsay grounds, we review for abuse of discretion.

## D.  Prosecutorial Misconduct

**[23]**     When a defendant has objected to prosecutorial comments during trial, we review the prosecutorial misconduct under a harmless error standard.  *People v. Mendiola*, 2010 Guam 5 ¶ 13 (citing *People v. Moses*, 2007 Guam 5 ¶ 7).  "In order for a [defendant] to succeed on a claim of prosecutorial misconduct, he must show that the 'prosecutor's 'comments' so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Evaristo*, 1999 Guam 22 ¶ 20 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  "A harmless error inquiry typically involves analysis of numerous factors, including: (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence."  *People v. Roten*, 2012 Guam 3 ¶ 41.

**[24]**     Cepeda's counsel objected to the prosecution's closing argument statements relating to community and tourism, an alleged violation of the "golden rule," Tr. at 16–17 (Jury Trial, May 20, 2019), a comment relating to Cepeda's failure to apologize, and the alleged vouching; therefore, the proper standard of review is harmless error. Additionally, prosecutorial misconduct is subject to cumulative-error analysis, which "'aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *People v. De Soto*, 2016 Guam 12 ¶ 69 (quoting *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003)); *see also Moses*, 2007 Guam 5 ¶¶ 57–58. "A cumulative-error analysis references all errors without qualification." *De Soto*, 2016 Guam 12 ¶ 69 (citing *Cargle*, 317 F.3d at 1207).

## IV.  ANALYSIS

### A.  The Evidence at Trial Was Sufficient to Convict Cepeda of Second Degree Robbery, the Special Allegation, and Theft of Property

**[25]**     Cepeda essentially argues that the evidence is insufficient because: (1) the essential elements of theft and robbery have not been established because the victim did not testify to her ownership over the items, nor did the victim testify to any other elements or the facts underlying the special allegation; and (2) the People presented only circumstantial evidence of events that occurred immediately after the alleged theft, rather than direct evidence of the robbery or theft *in progress* and direct evidence of Cepeda's possession of a machete during any robbery or theft. Appellant's Br. at 25, 27–30 (Feb. 7, 2020). The People argue: (1) that the identity of the victim is not an element of theft under Guam law and thus testimony of the victim is unnecessary to support a conviction; and (2) sufficient circumstantial evidence was presented to support the convictions of theft, robbery, and the special allegation. Appellee's Br. at 5–6 (Mar. 5, 2020).

**1. The victim did not need to testify to satisfy the elements of the crimes charged**

[26]     This court found in *People v. Tennessen* that "[t]he names of the owners of the stolen property constitute no part of the offense [of theft].  They are stated in the information primarily as a matter of description for the purpose of identification and to show ownership in a person or persons other than the accused."  2009 Guam 3 ¶ 23 (quoting *Hearn v. State*, 55 So. 2d 559, 561 (Fla. 1951) (en banc)), *overruled on other grounds by Barrett-Anderson v. Camacho*, 2018 Guam 20.  Thus, identification of the victim is not an essential element, and "in a theft or larceny statute, the People need only prove that someone other than the defendant has some possessory interest in the stolen property."  *Id.* ¶ 24.

[27]     Circumstantial evidence sufficiently established that Cepeda did not have a possessory interest in, at minimum, the passport and the bag, which together exceed the $50 threshold to support a conviction of misdemeanor theft.  Mesa-Tenorio testified that she saw the defendant "running with a woman's bags" and observed "a woman screaming from her car."  Tr. at 24–25 (Jury Trial, May 13, 2019).  San Agustin also testified that she saw the defendant clutching a "purple and white bag" and a machete while running away from "two tourists who looked like they were in distress."  *Id.* at 37–39.  Officer Lujan testified that a passport, Exhibit 10F, was found in or near the purple and white purse and that the passport did not depict Cepeda.  Exhibit 10G, an enlarged photo of the passport, showed that the person depicted in the passport was Keumja Yoon.  Officer Lujan further testified that the items depicted in the photographic exhibits were "relinquished back to the victim . . . the same person that's in [the] passport."  Tr. at 67 (Jury Trial, May 14, 2019).  These facts, taken together, are sufficient to support an inference that Cepeda did not have a possessory interest in the purple and white bag or the passport found near his person at the time of his arrest.

[28]    Cepeda does not provide, and this court is not aware of, any caselaw to support the assertion that the victim of a theft must testify to uphold a conviction. *See* Appellant's Br. at 29. Because there is no support for the assertion, and because alternative circumstantial evidence was sufficient for a rational trier of fact to establish that someone other than Cepeda had a possessory interest over the property, we hold the victim did not need to testify to establish that a theft occurred.

### 2. The circumstantial evidence was sufficient to support the convictions of theft, robbery, and the special allegation

[29]    Cepeda argues that the evidence was insufficient because the People presented no direct evidence or eyewitness account of the crimes while in progress. Appellant's Br. at 29–30. However, this court and others have consistently held that circumstantial evidence alone is sufficient to submit a matter to the jury and to support a conviction. *E.g.*, *People v. McKinney*, 2016 Guam 3 ¶ 22 ("'[E]ntirely circumstantial' evidence is sufficient to support a guilty verdict."); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n.17 (1957) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). As we have explained,

> When ruling on a motion for judgment of acquittal, the trial court is concerned with the existence or nonexistence of evidence, not its weight, and this standard remains constant even when the People rely exclusively on circumstantial evidence. . . . "[I]f there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury." *State v. Elmore*, 628 S.E.2d 271, 273 (S.C. Ct. App. 2006).

*People v. Song*, 2012 Guam 21 ¶ 29 (internal citations omitted). Based on the circumstantial evidence about the events immediately following the alleged crimes, when viewed in the light

most favorable to the People, a rational trier of fact could have found the essential elements of theft, robbery, and the corresponding special allegation.

[30]     "A person is guilty of *theft* if he unlawfully takes or obtains or exercises unlawful control over, movable property of another with intent to deprive him thereof."  9 GCA § 43.30(a) (2005). "*Property of Another* includes property in which any person other than the defendant has an interest which the defendant is not privileged to infringe . . . ."  *Id.* § 43.10(e).  Theft that is not a second- or third-degree felony is a misdemeanor "if the amount involved exceeds Fifty Dollars ($50) . . . ."  *Id.* § 43.20(c).  Here, several eyewitnesses testified that Cepeda was apprehended with property in which he did not appear to have a possessory interest.  At minimum, the evidence was sufficient to establish that Cepeda did not have a possessory interest in the purple and white bag or the passport, and although no evidence was presented of the exact monetary value of each item, it was reasonable of the jury to conclude that together their value exceeded the threshold of fifty dollars.  All three civilian witnesses testified that the apparent owner of this property exhibited considerable distress over losing the property, and all witnesses testified that Cepeda ran away from the victim and from police, suggesting that taking the purse was unlawful and with intent to deprive the owner.  From these facts, a reasonable trier of fact could conclude that each element of theft had been satisfied.

[31]     "A person is guilty of *robbery in the second degree* if, in the course of committing a theft, he . . . is armed with or displays what appears to be explosives or a deadly weapon."  9 GCA § 40.20(a)(3).  A "deadly weapon" is defined as "any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to the defendant to be capable of producing death or serious bodily injury."  9 GCA § 16.10(d) (2005).  Because the witnesses testified to events immediately following the theft

which support an inference that Cepeda was armed with or displayed a machete during the theft, the evidence presented was sufficient to establish that a robbery occurred.

[32]    Nunez testified that he witnessed Cepeda run away from two women of Asian descent into a "bushy area," and when Cepeda emerged from the bushy area he was holding "an old, rusty machete" that was "probably 12 to 15 inches in length." Tr. at 11-12, 14 (Jury Trial, May 13, 2019). Mesa-Tenorio testified that the man she saw running with a white and purple bag was also carrying a machete "when he went into the jungle," *id.* at 27, but later clarified that "[i]t was only after he was running into the jungle, away from the police, that [Mesa-Tenorio] noticed the machete," *id.* at 28. San Agustin also testified that she witnessed "a man running with a machete in his hand and two tourists who looked like they were in distress." *Id.* at 37, 39. Although there was no testimony confirming that Cepeda displayed or carried the machete when he took the property from the victim, the eyewitness accounts of the machete in his possession in the minutes immediately following the crime are sufficient to establish the elements of robbery.

[33]    Title 9 GCA § 80.37 provides a sentence enhancement whenever an offender "unlawfully possesses or uses a deadly weapon in the commission of a felony punishable under the laws of Guam." As the People presented sufficient circumstantial evidence to support an inference that Cepeda possessed or used the deadly weapon of a machete in the commission of the felony robbery, we find there to be sufficient evidence to support the special allegation.

[34]    Under our highly deferential standard of review, the evidence was sufficient to convict Cepeda of Second Degree Robbery, the Special Allegation, and Theft of Property.

## B. Substantive Statements Made by the Non-testifying Victim Were Not Impermissibly Admitted, and the Right to Confront Witnesses Was Not Violated

[35]    Cepeda argues that the trial court violated his rights to due process and confrontation by admitting the testimony of Officer Lujan and Exhibits 10A-10J, which referenced property

confiscated by police as belonging to the victim. Appellant's Br. at 26, 30–31. Cepeda argues that references to the victim's ownership of the property constituted "evidence of out of court statements by the absent victim(s) establishing that property confiscated from Cepeda belonged to the victim(s)." *Id.* at 31. The People contend there was no violation of Cepeda's right to confrontation because "none of the victims' statements were entered into the evidence," and any statement or conduct that could be said to have been entered into evidence was not testimonial. Appellee's Br. at 8–9. We review evidentiary rulings implicating constitutional rights, including the right to confront witnesses, *de novo*. *Diego*, 2013 Guam 15 ¶ 8. We apply the harmless error standard to determine whether reversal is required. *Kotto*, 2020 Guam 4 ¶ 14.

[36] The Confrontation Clause of the Sixth Amendment, made applicable to Guam through the Organic Act, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S Const. amend. VI; *see also* 48 U.S.C.A § 1421b(g), (u) (Westlaw through Pub. L. 117-36 (2021)). The United States Supreme Court held in *Crawford v. Washington* that the Confrontation Clause bars out-of-court testimonial statements by witnesses unless such witnesses are unavailable and the defendant had prior opportunity to cross-examine the witnesses. 541 U.S. 36, 53–54 (2004). However, confrontation rights are implicated only for "'witnesses' against the accused," meaning "those who 'bear testimony.'" *People v. Kitano*, 2011 Guam 11 ¶ 38 (quoting *Crawford*, 541 U.S. at 51). Testimony can be both verbal and nonverbal. *See* Guam R. Evid. 801(a) ("A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."). Thus, conduct may be considered testimonial if it is intended as an assertion and its "'primary purpose' . . . was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (second alteration in original) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)).

Statements "primarily aimed at quelling an ongoing emergency, not establishing evidence for the prosecution," are not testimonial, *id.*, and "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Bryant*, 562 U.S. at 358.

### 1. No out-of-court statements by the absent victim were admitted

[37]     Cepeda contends that any evidence relating to the ownership of the property recovered by the police was based on "out of court statements by the absent victims [sic]." Appellant's Br. at 31. However, no direct oral or written statements of the victim were admitted into evidence. Nunez and Mesa-Tenorio both testified that Cepeda was running away with the victim's belongings, but nothing in the record revealed these impressions were based on statements made by the victim. Similarly, at no point during Officer Lujan's testimony did he reference any positive verbal or nonverbal identification of the property made by the purported victim. Officer Lujan testified that "[p]ersonal belongings to the victim" were discovered around the defendant at the time of his arrest including "a purse and some personal belongings that the victim owned." Tr. at 54 (Jury Trial, May 14, 2019). Officer Lujan further testified that the physical evidence was "confiscated" and later "relinquished back to the owners." *Id.* at 60. While authenticating the exhibits, Officer Lujan identified the purse as "the victim's bag" and "a passport and the wallet and an I.D. . . . [t]hat was property that was taken from the victim," also without objection from Cepeda. *Id.* at 63. Various additional comments relating to the ownership of the items were made by Officer Lujan without objection, and he confirmed that the items depicted in the photographic exhibits were "relinquished back to the victim . . . the same person that's in that passport." *Id.* at 66–67. Yet nowhere in Officer Lujan's testimony did he specify on what basis he concluded that the items belonged to the victim, let alone that it was based on a statement by the victim.

### 2. The victim's acceptance of the items at the precinct was not testimonial

[38]    Although not directly stated by Cepeda, one can conclude from his brief and from the transcript of the sidebar he alleges any such reference to "the victim's belongings" must stem from some identification made by the victim herself, namely, the nonverbal act of accepting the items at the police precinct. *See id.* at 3–10. However, we find Cepeda has not met his burden to establish that the primary purpose of the conduct was to replace testimony in court, *see Clark*, 576 U.S. at 244–45, and therefore the act of accepting the property was not testimonial. As the People argue, any assertion of ownership made by the victim might also have been to end an ongoing emergency, so it would not trigger the Confrontation Clause. Appellee's Br. at 11.

[39]    None of the lay witnesses testified about the content of any conversations with the victim, and police assertions about the ownership of the items were not based solely on the purported victim's collection of the items at the police department, but on the circumstances of the events witnessed and the identity of the person depicted in the passport. Thus, mere references to the victim's ownership absent in-court testimony by the victim does not create a confrontation issue.

### 3. If the victim's conduct could be deemed inadmissible testimony, it would nonetheless be harmless error

[40]    The People argue that even if this court were to find that testimonial conduct of the absent victim was included during Officer Lujan's testimony in violation of the Confrontation Clause, the error was harmless beyond a reasonable doubt. "A harmless error inquiry typically involves analysis of numerous factors, including: (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence." *Roten*, 2012 Guam 3 ¶ 41.

**[41]** Officer Lujan's testimony about relinquishing the purse and the passport at the precinct was cumulative of other properly admitted evidence relating to the ownership of those items, including the exhibit depicting the passport of Keumja Yoon and the statements of the civilian witnesses based on their own impressions. Evidence relating to the ownership of the items was unimportant because, as noted in Part IV.A.1 above, theft does not require proof of the identity of the property's owner—it merely requires a showing that the defendant lacked a possessory interest. The record does not support a finding that Officer Lujan's testimony had a considerable effect on the jury's verdict. Thus, even if the victim's act of receiving the items could be considered a testimonial act, its admission through the testimony of Officer Lujan would still be harmless beyond a reasonable doubt.

## C. Testimony by Officer Lujan Relating to the Ownership of the Stolen Items Did Not Amount to Hearsay; Admitting the Evidence Was Not an Abuse of Discretion

**[42]** Cepeda argues that the trial court erred in admitting the testimony of Officer Lujan about the ownership of the stolen items because it was inadmissible hearsay and because Officer Lujan lacked personal knowledge, rendering his testimony incompetent. Appellant's Br. at 26. The People argue that Officer Lujan's testimony did not include hearsay because (1) he did not testify about any conversation he had with the victim, and (2) the action of relinquishing items back to the owner and of the owner receiving such items cannot be hearsay because such actions are not intended as an assertion. Appellee's Br. at 14–15. The People assert that even if Officer Lujan's testimony included hearsay, the trial court did not abuse its discretion in permitting it. *Id.* at 15.

**[43]** The United States Supreme Court stated in *Michigan v. Bryant* that the admissibility of statements the primary purpose of which is not testimonial "is the concern of state and federal rules of evidence, not the Confrontation Clause." 562 U.S. at 359. Hearsay is an out-of-court statement offered for the truth of the matter asserted. Guam R. Evid. 801(c). Besides an oral or

written assertion, a "statement" also includes "nonverbal conduct of a person, if it is intended by the person as an assertion." Guam R. Evid. 801(a). Hearsay is inadmissible unless otherwise permitted by law, other rules of evidence, or "other rules prescribed by the Supreme Court of Guam pursuant to statutory authority." Guam R. Evid. 802. Exceptions to the hearsay rule include present sense impressions that describe events or conditions while being perceived and excited utterances made under the stress of excitement caused by an event or condition. Guam R. Evid. 803(1), (2).

[44] No out-of-court verbal statements of the victim were admitted during Officer Lujan's testimony. The only nonverbal conduct of the victim which could be said to have been offered during Officer Lujan's testimony was the nonverbal act of accepting the items at the police precinct. But we are not persuaded that such an act was intended as an assertion. Nonverbal conduct is assertive only when used to replace words to express a fact or opinion. *See, e.g.*, *United States v. Katsougrakis*, 715 F.2d 769, 773–74 n.4 (2d Cir. 1983) (a nod replacing a verbal "yes" or "no" is assertive); *Dyson v. State*, 615 A.2d 1182, 1186 (Md. Ct. App. 1992) (pointing to knot in radio in response to judge's request to "point, if you would, to the area that you were referring to in your testimony" was assertive); *United States v. Ross*, 321 F.2d 61, 69 (2d Cir. 1963) (pointing to written list in response to question was assertive because it indicated that "[t]his is a list of the names and numbers of the salesmen").

[45] In interpreting Federal Rule of Evidence 801(a), on which Guam Rule of Evidence ("GRE") 801(a) is based, the Advisory Committee on Proposed Rules stated that "[t]he rule is so worded as to place the burden upon the party claiming that the intention [to make an assertion through nonverbal conduct] existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility." Fed. R. Evid. 801(a) advisory committee's note on proposed rules;

*see also, e.g.*, *United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996); *United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990). We find federal decisions interpreting the rules upon which our own rules are based to be persuasive, *see People v. Quitugua*, 2009 Guam 10 ¶ 10, and we agree that GRE 801(a) places the burden of proof on the party claiming that the intention existed. Cepeda has not met his burden to show that accepting the items was intended as an assertion of ownership rather than a means to regain control of the items. We find the conduct was not assertive and is therefore not inadmissible hearsay.

[46]     If accepting the items could have been intended as an assertion, its admission was not an abuse of discretion, and any error was harmless because the testimony was cumulative to other duly admitted evidence. In *Roten*, we held that the admission of an officer's hearsay testimony was harmless error because it was "essentially identical to that provided by the victim," and "[e]rroneous admission of duplicative or cumulative testimony is less prejudicial than admission of unique testimony." 2012 Guam 3 ¶ 43. Here, other evidence had been presented showing that the purported victim was the owner of the items found in Cepeda's possession at the time of his arrest. And evidence relating to the ownership of the items was unimportant because theft does not require proof of the identity of the property's owner. Under the *Roten* factors, it is therefore unlikely that any abuse of discretion in admitting Officer Lujan's testimony would have contributed to the jury's verdict.

### D. Although the Prosecution Made Inflammatory Comments, the Prosecution Did Not Violate the "Golden Rule," Violate the Defendant's Fifth Amendment Rights, or Vouch for Absent Witnesses

[47]     Cepeda argues that the prosecution engaged in misconduct during closing arguments which directly resulted in the guilty verdicts against him. Such alleged misconduct included: (1) comments calculated to inflame the prejudices of the jury; (2) comments that violated the "golden

rule"; (3) comments that violated Cepeda's Fifth Amendment rights; and (4) comments that vouched for absent victim witnesses. Appellant's Br. at 26. Cepeda contends these errors, individually or cumulatively, warrant reversal and acquittal. *Id.* The People concede that comments during closing argument in relation to community and tourism were inflammatory, Appellee's Br. at 20, but argue that "inflammatory comments made by the prosecutor are not sufficient to warrant a new trial when there is more than sufficient evidence to support and uphold a conviction." *Id.* at 19 (citing *Moses*, 2007 Guam 5 ¶ 31). Because there was more than sufficient evidence to uphold the conviction and no other misconduct occurred, the People argue that the comments were harmless and reversal is not required.

### 1. Inflammatory comments

[48]     Cepeda argues that during closing argument, the prosecution improperly made several comments about Guam's sense of community and tourism, which were calculated to inflame the prejudices of the jury against the defendant. The People concede that such comments were inflammatory but argue that they do not warrant reversal because they did not affect the jury's verdict.

[49]     We examine the prosecutor's comments "within the context of the entire trial to determine whether it is more probable than not that the allegedly improper remarks materially affected the verdict"—that is, whether the remarks "affected the jury's ability to judge the evidence fairly." *Moses*, 2007 Guam 5 ¶ 30 (quoting *United States v. Endicott*, 803 F.2d 506, 513 (9th Cir. 1986)). During closing, the prosecutor argued:

> So the theme of the People's closing is community. Now, we live in Guam, and on our island of Guam, Guam is basically a tourist destination. Our biggest industry is tourism. We have . . . warm tropical weather, beautiful sandy beaches, we have fancy hotels . . . .

However, ladies and gentlemen, especially in this part of the world, we're not the only one with fancy -- fancy hotels and nice sandy beaches. There are other places in the world . . . not too far away where you have these same things.

. . . . And yet even though there are these other places, even though some of them may or may not be cheaper, . . . [t]ourists choose to pay a little bit extra to come to our island, our home. And why is that, ladies and gentlemen? . . . And the People submit that the reason why people are willing to pay a little bit extra to come to our home, to our island, is because of our community, it's because of our values, it's because of the way that we were raised. It's because of the way that we treat people.

. . . .

. . . . This is what our values are.

And what this case does, ladies and gentlemen, is it highlights the very best of our --

Tr. at 11–13 (Jury Trial, May 20, 2019). The defense objected in a sidebar on the grounds of prejudice to his client, and after continued discussion, the trial court asked the prosecution to "move on." *Id.* at 14. When counsel returned from sidebar, the prosecution started again with "Our sense of community. What this case does, ladies and gentlemen, is shows the very best of our community," to which the defense again objected, prompting the trial court to ask the prosecution once again to move on. *Id.* at 14–15. Shortly thereafter, the prosecution mentioned tourism and community a third time when he mentioned "[t]wo tourists in desperate need of assistance. And then in contrast to the very best of our community, consider what the tourist experienced," to which the defense again objected, and the trial court sustained. *Id.* at 16–17.

[50]    In *Moses*, the prosecutor expressed personal disgust and outrage, implied that conviction would be the only way to protect "our kids" from the defendant, and repeatedly used the word "God" in closing argument, including using the phrase "as God as [sic] my witness" twice. *Moses*, 2007 Guam 5 ¶¶ 12–13, 31, 33. Yet we declined to find these inflammatory comments had affected the jury's verdict because the testimony of the victim, an expert, and the victim's family

members rendered it "highly unlikely that the prosecutor's personal opinions were the determining factor in the jury's verdicts." *Id.* ¶ 32.

[51] Conversely, in *HRC Guam Co. v. Bayview II L.L.C.*, we found that the attorney misconduct during closing argument was serious enough to warrant a new jury trial. 2017 Guam 25 ¶¶ 108, 120. There, we noted that "zealous advocacy is not without limits" and "an attorney is not permitted to appeal to the prejudices or passions of a jury." *Id.* ¶¶ 95–96. We held that Bayview's counsel "went far beyond the line of propriety" by repeatedly mentioning that the opposing party's owner was from off-island while his own client had "close connections to Guam." *Id.* ¶¶ 99–100. Bayview's counsel argued that the opposing party had "the nerve to come in here in front of this jury and tell Guam citizens that this elder gentleman, a statesman of Guam, a pioneer in Guam is cheating them" and asked the jury to "show [the opposing party] that it's a privilege to do business in Guam." *Id.* ¶ 100. Although *HRC* was a civil case, the standard for attorney misconduct remains applicable in the criminal context.

[52] We agree with Cepeda that the comments made by the prosecutor in relation to community and the tourism industry were egregiously inflammatory. At least three attempts were made to improperly appeal to the emotions of the jury rather than to argue the evidence. While the attorney in *HRC* improperly asked the jury to favor a resident corporation over a nonresident corporation, here the prosecutor improperly asked the jury to favor a nonresident, albeit to benefit Guam's tourism industry. Both instances impermissibly called upon the jury to decide not based on the law or the facts but based on the implications for Guam and the tourism industry. However, the standard for reversal for prosecutorial misconduct is high. Though serious, the comments of the prosecution were less pervasive than that of Bayview's counsel in *HRC* and were mitigated by the immediate objections of defense counsel and admonitions by the trial court to "move on."

Because there was more than sufficient evidence to support the conviction, we do not find that the comments were the determining factor in the jury's guilty verdicts or that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *De Soto*, 2016 Guam 12 ¶ 63 (quoting *Evaristo*, 1999 Guam 22 ¶ 20).[1]

### 2. The Golden Rule

[53]    Cepeda argues that the prosecution violated the "golden rule"—which prohibits counsel from asking jurors to imagine themselves in the place of the victims—by asking the jury to "[c]onsider what these two Asian women experienced." Appellant's Br. at 18-19, 48 (quoting Tr. at 17 (Jury Trial, May 20, 2019)). We have held the "golden rule" argument "suggest[ing] that jurors place themselves in the position of a party or victim" to be "impermissible because it tends to encourage the jurors to view the matter as a party in the case." *Evaristo*, 1999 Guam 22 ¶ 19. To warrant reversal, the comments must be made "in such a way that the conviction was based upon passion, bias or sympathy" rather than the evidence. *Id.* In evaluating such comments, the court should look at the full context of the record, including when and how often the golden rule remarks were made, whether the defense objected to each instance, and whether there was a jury instruction to disregard such comments or a reminder that statements made by attorneys during trial are not evidence. *See id.* ¶ 21. In *Evaristo*, the violation was explicit—the prosecutor asked the jury to "imagine this knife stuck into your wife"—and yet the court found that such a comment did not influence the jury enough to be prejudicial. *Id.* Here, the prosecution did not ask the jury to place themselves in the position of the victims. Considering the full context of the record and

---

[1] Although the prosecutor's misconduct was not serious enough to warrant a new trial, he came perilously close to crossing the line established in *HRC*. The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict, and a prosecutor should respect the constitutional and legal rights of all persons, including suspects and defendants. *See People v. Blas*, 2016 Guam 19 ¶ 43 n.6.; ABA Standards for Criminal Justice, Prosecution Function, Standard 3-1.2(c) (4th. ed. 2017).

the lack of more explicit language typical of a "golden rule" challenge, we are not persuaded that the comment influenced the jury enough to warrant reversal.

### 3. Fifth Amendment right against self-incrimination

[54] Cepeda asserts that the prosecution's comment on his failure to apologize to the victim violated his Fifth Amendment right against self-incrimination because it called the jury's attention to his silence before and during trial. Appellant's Br. at 48–49. Cepeda also asserts that the comment violated his statutory right "to be exempt from being called to testify and from testifying against himself" and not to have the failure to testify be used as evidence against him. *Id.* at 49 (quoting 8 GCA § 1.11(d), (e) (2005)). Cepeda further asserts that a defendant's neglect or refusal "to be a witness cannot in any manner prejudice him nor be used against him at the trial." *Id.* (quoting 8 GCA § 75.60 (2005)). The People argue that the prosecutor's remark was not intended to refer to Cepeda's silence but to explain that Cepeda was trying to escape from the crime scene and that the escape showed a consciousness of his guilt. Appellee's Br. at 22. The People further assert that the remark would not naturally be taken by the jury as a comment on the defendant's silence. *Id.*

[55] In *Griffin v. California*, the Supreme Court held that prosecutorial comment on the failure of a defendant to testify violates the Fifth Amendment and constitutes reversible error. 380 U.S. 609, 612–15 (1965). The prosecution in *Griffin* explicitly commented on the defendant's failure to take the stand: "These things he has not seen fit to take the stand and deny or explain." *Id.* at 611. In *United States v. Tarazon*, the Ninth Circuit held that "[a] prosecutor's comment is impermissible if it is manifestly intended to call attention to the defendant's failure to testify or is of such a character that the jury would naturally and necessarily take it to be a comment on the

failure to testify." 989 F.2d 1045, 1051–52 (9th Cir. 1993); *see also People v. Cruz*, 2016 Guam 15 ¶ 19.

**[56]** The prosecution here did not directly refer to Cepeda's failure to testify; rather, the prosecution stated, "[T]here was no evidence of an apology. There was no evidence that Mr. Cepeda checked on [the victim]." Tr. at 19 (Jury Trial, May 20, 2019). The defense objected, and after a sidebar the prosecution was asked to rephrase. *Id.* The prosecution continued:

> The defendant doesn't have to testify. The defendant doesn't have to talk on his own behalf, and you can't use that against him.
>
> However, you heard the evidence of the case. You heard the evidence [sic] that observed the robbery. None of the eyewitnesses testified about an apology. None of the eyewitnesses testified about the defendant checking on these Korean tourists after he committed the crime against them.

*Id.* at 20.

**[57]** A comment on a failure to apologize does not automatically cause the jury to take it as a comment on the defendant's failure to testify. The prosecution attempted some mitigation by reminding the jury that "[t]he defendant doesn't have to testify. The defendant doesn't have to talk on his own behalf, and you can't use that against him." *Id.* Thus, we do not find a *Griffin* error in the prosecution's brief comment about Cepeda's failure to apologize.

### 4. Vouching

**[58]** Finally, Cepeda asserts that the prosecution engaged in improper vouching for the non-testifying victim based on evidence not admitted by (1) commenting about the confiscated property belonging to the victim and (2) stating that "[t]here's been no indication that securing Ms. Yoon's appearance in Guam was possible for the [P]eople. There's no evidence that she's still here in Guam. There's no evidence that she left, just that she wasn't available to testify." Appellant's Br. at 6, 24, 50 (quoting Tr. at 49 (Jury Trial, May 20, 2019)).

**[59]** Vouching may occur when a prosecutor implies knowledge and access to evidence not presented to the jury or otherwise inadmissible. *See United States v. Young*, 470 U.S. 1, 18–19 (1985). Courts have also held that any insinuation of personal knowledge or belief of the defendant's guilt constitutes prosecutorial misconduct. *See, e.g.*, *United States v. Bradley*, 917 F.3d 493, 505–06 (6th Cir. 2019); *Lafond v. State*, 89 P.3d 324, 335–36 (Wyo. 2004); *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991); *Brokenbrough v. State*, 522 A.2d 851, 859 (Del. 1987) (per curiam). We have also held that arguing facts not in evidence constitutes attorney misconduct. *HRC*, 2017 Guam 25 ¶ 103; *Mendiola*, 2010 Guam 5 ¶ 22; *see also Berger v. United States*, 295 U.S. 78, 84 (1935). Counsel may "indulge in all fair arguments" but "may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences." *HRC*, 2017 Guam 25 ¶ 103 (quoting *Malkasian v. Irwin*, 394 P.2d 822, 828 (Cal. 1964) (in bank)). In *Mendiola*, for example, we found prosecutorial misconduct when the prosecutor opined about the truthfulness of children and their ability (or inability) to make up allegations of sexual abuse. 2010 Guam 5 ¶¶ 20–22. As there had been no admitted testimony on the truthfulness of children, we held that the prosecutor "improperly commented on facts not in evidence." *Id.* ¶ 22.

**[60]** Here, various witnesses testified that the items recovered belonged to the victim, so prosecutorial comment on the confiscated property belonging to the victim is not improper vouching. Regarding the victim's availability, unlike in *Mendiola*, the prosecutor presented no new material evidence in his closing statements. The prosecution only pointed out there was no evidence on the record about a certain issue. These statements are more like those in *Young*, where the prosecutor presents an inference about the evidence already properly admitted. The prosecution is permitted wide latitude to present reasonable inferences to the jury, *People v. Reyes*, 2020 Guam 33 ¶ 44, and the prosecution here did just that.

### 5. Cumulative-error review

**[61]** The inflammatory comments about tourism and community, although serious, are the only instances of prosecutorial misconduct and do not warrant reversal individually. Therefore, no cumulative-error analysis is necessary.

## V. CONCLUSION

**[62]** We find the evidence sufficient to support Cepeda's conviction for Theft as a Misdemeanor and Second Degree Robbery, with the Special Allegation of Possession or Use of a Deadly Weapon in the Commission of a Felony. We also find no violation of Cepeda's right to confront witnesses and no abuse of discretion in admitting evidence about the ownership of the recovered property. Although the prosecution concedes that inflammatory comments were made during closing arguments, there was more than sufficient evidence to support the conviction, so the misconduct, though serious, was harmless and does not warrant reversal.

**[63]** We **AFFIRM** the judgment of conviction.


| /s/ | /s/ |
| :---: | :---: |
| ROBERT J. TORRES | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |


/s/

F. PHILIP CARBULLIDO

Chief Justice