

**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**JEFTA MOSES,**
Defendant-Appellant.

Supreme Court Case No.: CRA21-005
Superior Court Case No.: CF0410-18

## OPINION

## Cite as: 2022 Guam 17

Appeal from the Superior Court of Guam
Argued and submitted on March 21, 2022
Via Zoom video conference

Appearing for Defendant-Appellant:
Terry E. Timblin, *Esq.*
Law Office of Terry E. Timblin, PC
Ada's Capitol Plaza Bldg.
120 Father Duenas Ave., Ste. 105B
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Jeremiah B. Luther, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 801
Tamuning, GU 96913

**E-Received**
12/29/2022 3:20:35 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, J.:**

[1]      Defendant-Appellant Jefta Moses appeals a final judgment of conviction sentencing him on two counts of First Degree Criminal Sexual Conduct ("CSC") and two counts of Second Degree CSC.  Moses claims the trial court erred in denying his motion for judgment of acquittal on the First Degree CSC charges because, he says, there was insufficient evidence of this charge.  Moses asks the court to reduce his First Degree CSC convictions to Third Degree CSC and remand the case for resentencing.  Alternatively, Moses argues the trial court erred in denying his motion for a new trial based on allegations of prosecutorial misconduct, and he should be re-tried.  We affirm the judgment of conviction.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Alleged Sexual Assault

[2]      In June 2018, J.W. resided in the NCS neighborhood of Dededo and worked at a restaurant in Tumon.  J.W.  testified she had an arrangement with her "Nina" to pay her Nina's monthly car payments in exchange for J.W.'s use of the vehicle.  J.W. was scheduled to work an evening shift on the date of the incident.  When J.W. arrived at work, her Nina met her in the parking lot and demanded both the vehicle and the car payment.  J.W. complied and removed her bag from the car.  J.W. was upset because she no longer had a vehicle, so she punched the walls in the back of the restaurant; she experienced cuts and swelling on her hands.  After her shift ended, J.W. failed to reach anyone at her household to pick her up from work.  Her cell phone battery died, and she decided to walk home.

**[3]**     J.W. testified that it was "almost 11:00 [p.m.] when [she] got to GRMC"[1] and Okkodo High School soon thereafter. Transcript ("Tr.") at 107, 109 (Jury Trial, Nov. 21, 2019). She testified that a man, whom she identified at trial as Moses, came from behind her and asked for a lighter for his cigarette. J.W. testified that she gave Moses her lit cigarette, but he followed her and asked her several questions such as where she was going and where she lived. J.W. responded but pleaded with Moses to not do anything to her because she was trying to go home to her children.

**[4]**     J.W. testified that after they passed a telephone pole in a dark area, Moses dragged her into the jungle and slammed her on the ground. J.W testified that she yelled for help, but Moses covered her mouth with his hands and told her to be quiet. He then told her she could leave after she had sex with him. J.W. testified that Moses sexually assaulted her two times. She testified that Moses vaginally assaulted her with his penis in the jungle. J.W. testified that Moses tried to remove her pants, but J.W. removed them herself because she thought Moses might kill her after he sexually assaulted her, and then no one would find her remains. J.W. testified that she looked up at the sky and thought she would never see her family or kids again and prayed to God for a way out of the situation. J.W. explained that during the first intercourse, Moses asked her if she eats, and she said that she does not; she interpreted this to mean whether she would perform oral sex. On cross-examination, J.W. was asked whether Moses may have been referring to something else. She responded: "What? Like eating the vagina or like jacking off kind of thing because when he said eating I just like that he was talking about like me going on him, like sucking his dick." Transcript ("Tr.") at 37 (Jury Trial, Nov. 22, 2019).

**[5]**     J.W. testified that after the first intercourse, she stood up to leave, but Moses demanded to have sex one more time and pushed her to the ground. She said she landed on rocks and sticks,

---

[1] The witness seems to be referring to the Guam Regional Medical City.

which caused scratches and pain on her backside. J.W. compared it to the feeling of a rock being thrown to her back and said it caused "a shocking pain." Tr. at 121 (Jury Trial, Nov. 21, 2019). She also received a cut on her right knee and a scratch on top of her breasts from trees. J.W. claimed that Moses lay on the ground, grabbed her arm, and pulled her on top of him.

[6]     J.W. explained that she got on top of Moses because she feared Moses would kill her if she did not comply. According to J.W., Moses made her go up and down and reengaged the sexual intercourse with her when she tried to get off him; she testified that she begged him to let her go. J.W. testified that Moses ejaculated in her during both intercourses. On direct examination, J.W. testified that Moses took between $200 and $300 from her bag after the second sexual assault. She testified that Moses let her go after he stole the money from her bag. On cross-examination, J.W. clarified that she reported to the police that Moses stole only $120 from her bag.

[7]     J.W. said that she ran out to the road and flagged down a driver, later identified as Chris, after the assault. J.W. told Chris she had been raped and asked him to drive her home; Chris complied. Just after her arrival at home, J.W. told her partner she had been raped.

**B.  Expert Witness Testimony**

[8]     At around 1:00 a.m. the next day, J.W. went to the Guam Regional Medical City ("GRMC") emergency room. Officer Kim from the Guam Police Department ("GPD") was dispatched to GRMC to investigate the alleged sexual assault. He testified that he observed J.W. crying in a fetal position and described her as distraught. Officer Kim requested J.W. to come to the precinct after she left the hospital, and he tried to contact Healing Hearts Crisis Center. Maria Teresa Aguon, a program manager at Healing Hearts Crisis Center, explained that Healing Hearts

provides services to victims of sexual assault and abuse and called it "Guam's rape crisis center."[2] Tr. at 75-76 (Jury Trial, Nov. 21, 2019).

[9]      AnnParo Rios, a psychiatric nurse at Healing Hearts, was certified as an expert in sexual assault examination; Rios treated J.W. at Healing Hearts. As part of the examination, Rios completed a report called the "Healing Hearts Medical Examination Form" which covers the patient's pre- and post-assault health history, and chronicles details about the sexual assault. *See* Tr. at 137-38 (Jury Trial, Nov. 22, 2019). In terms of pre-assault health history, J.W. reported injuries on her knuckles. Rios testified that J.W. did not explain the injuries on her hand other than that it occurred that week.

[10]     For the post-sexual-assault history, J.W. reported pain on her left breast, mid- and lower back, and knees. Rios examined J.W. for injuries and found bruising and pinpoint abrasions on her knees as well as scratch marks on her breast and thigh. Rios explained that pinpoint abrasions referred to small abrasions about the size of the dot from a pen, and J.W. was not prescribed any medication for the abrasions. J.W. told Rios that on a scale out of ten, ten being the worst, she experienced six out of ten mid-back pain during the assault. She rated her lower back pain as ten out of ten. Rios also evaluated J.W. for genital findings, which Rios described as things such as cuts, tearing, or bruising in the genital area; Rios testified there were no genital findings. Rios explained that based on her professional experience, a lack of genital findings is normal. Several factors affect the likelihood of genital findings, such as the victim's age, whether the victim has had children, whether the assault was painful, and whether ejaculation occurred.

//

//

---

[2] GPD's protocol is that when the police are notified of a sexual assault that occurred within the previous 72 hours, they refer the victim to Healing Hearts to collect physical evidence. *See id.* at 34.

## C.  Mental and Emotional Impact of the Assault

[11]    J.W. and her partner testified about the psychological and emotional effect of the alleged

sexual assault on J.W.  For instance, the prosecutor and J.W. had the following exchange:

> Q:      Okay.  How has this incident affected you?
>
> A:      It changed me.
>
> Q:      How would you say?
>
> A:      I'm more blunt and . . . to the point where like I don't really care what anyone says.
>
> . . . .
>
> Q:      Do you ever get flashbacks of the incident?
>
> A:      Yes.
>
> Q:      How often?
>
> A:      For example, like when I – I used to watch like Law and Order and stuff and there's parts where they have -- they show like the rape and I'll like just have -- all I have to do is just hear it and that's when it just like happens, and I have to just like excuse myself.

Tr. at 138 (Jury Trial, Nov. 21, 2019).

[12]    J.W.'s partner testified that when Chris dropped J.W. off on the night of the assault, J.W.

was crying and was screaming that someone had raped her.  He observed J.W. at the hospital and

testified, "She was . . . scared . . . .  She's like crying, just like the same woman I first saw when

she came to the house, the same woman when she was at the hospital."  Tr. at 115 (Jury Trial, Nov.

22, 2019).  He had never seen J.W. like this before.  The prosecutor elicited the following testimony

from J.W.'s partner:

> Q:      Okay.  Now if you know, based on your personal observation, like how has this incident affected [J.W.]?
>
> . . . .

> A:      She's not the same. She doesn't like really look at me the same anymore. We don't really like communicate together as we did once before. . . . [S]he does her own things. I don't really have too much part in her life no more. . . . [L]ike sometimes she leaves me out of a lot of things, but I'm just there for my kids because she's not -- she doesn't really like how we -- she doesn't really treat me like how she used to do no more.

*Id.* at 116-17.

## D.  Procedural History

[13]    Moses's original indictment included two counts of First Degree CSC (As a First Degree Felony), five counts of Second Degree CSC (As a First Degree Felony), Kidnapping (As a Second Degree Felony), five counts of Fourth Degree CSC (As a Misdemeanor), and Theft (As a Misdemeanor). After Plaintiff-Appellee People of Guam ("People") rested its case, Moses moved for a judgment of acquittal on the First and Second Degree CSC charges and the Kidnapping charge. Moses argued the First Degree CSC charges should be dismissed because no reasonable juror could find evidence of sufficient bodily injury or mental anguish.

[14]    The People dismissed the Kidnapping charge, one of the Second Degree CSC charges, and one of the Fourth Degree CSC charges. The People amended the indictment and ultimately charged Moses with two counts of First Degree CSC (As a First Degree Felony), four counts of Second Degree CSC (As a First Degree Felony), four counts of Fourth Degree CSC (As a Misdemeanor), and Theft (As a Misdemeanor).

[15]    The jury returned guilty verdicts on all counts except for the theft charge, and Moses moved for a new trial. Moses alleged the People engaged in prosecutorial misconduct by directly and indirectly commenting on Moses's refusal to testify, by appealing to juror sympathy through inflammatory language, and by improperly emphasizing Moses's race. The trial court denied the motion. Moses timely appealed.

## II.  JURISDICTION

[16]    This court has jurisdiction to hear appeals from a final judgment of the Superior Court.  48 U.S.C.A. § 1424-1(a)(2) (Westlaw current through Pub. L. 117-248 (2022)); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

## III.  STANDARD OF REVIEW

[17]    "Where a defendant raised the issue of sufficiency of the evidence by a motion for judgment of acquittal, we review the trial court's denial of the motion *de novo*."  *People v. Song*, 2012 Guam 21 ¶ 26.  "In determining whether there exists sufficient evidence to sustain a defendant's conviction, we review the evidence presented at trial in the light most favorable to the People and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*  "This is a 'highly deferential standard of review.'"  *Id.* (quoting *People v. Tenorio*, 2007 Guam 19 ¶ 9).  "A verdict of guilty removes the presumption of innocence to which a defendant had formerly been entitled and replaces it with a presumption of guilt."  *People v. George*, 2012 Guam 22 ¶ 50 (per curiam) (citations omitted).

[18]    In terms of prosecutorial misconduct claims alleging a constitutional violation, we have already made the standard of review clear:

> "An alleged violation of the Fifth Amendment is reviewed *de novo*."  A conviction should be affirmed if the reviewing court concludes that, on the whole record, a constitutional error was harmless beyond a reasonable doubt.  It is the reviewing court's duty to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations.
>
> If no objections to jury instructions are made at the time of trial, the standard of review is plain error.  "Plain error is highly prejudicial error."  Thus, "[w]e will not reverse unless (1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process."

*People v. Cruz*, 2016 Guam 15 ¶¶ 16-17 (alteration in original) (citations omitted).

**[19]**    To prove an error affected his substantial rights, the defendant has the burden of showing there is "'a reasonable probability' that but for the claimed error the result of the proceeding would have been different." *People v. Lessard*, 2019 Guam 10 ¶ 16 (quoting *People v. Taisacan*, 2018 Guam 23 ¶ 37). We have also described this requirement as a showing by the defendant that "upon a review of the entire record, 'the probability of a different result is "sufficient to undermine confidence in the outcome" of the proceeding.'" *Id.* (quoting *People v. Quitugua*, 2009 Guam 10 ¶ 36). A miscarriage of justice occurs "when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." *People v. Reyes*, 2020 Guam 33 ¶ 25 (quoting *People v. Moses*, 2007 Guam 5 ¶ 36) (internal quotation marks omitted).

**[20]**    "The trial court's denial of a defendant's motion for a new trial is reviewed for an abuse of discretion." *People v. Leslie*, 2011 Guam 23 ¶ 12 (quoting *People v. Flores*, 2009 Guam 22 ¶ 9). "[A]n abuse of discretion occurs when this court has a 'definite and firm conviction the trial court, after weighing relevant factors, committed clear error of judgment in its conclusion.'" *People v. Camacho*, 2016 Guam 37 ¶ 49 (quoting *Leslie*, 2011 Guam 23 ¶ 16).

## IV.  ANALYSIS

**[21]**    Moses argues there was sufficient evidence of only Third Degree CSC and asks this court to vacate his First Degree CSC convictions and order him to be resentenced under the Third Degree CSC statute. *See* Appellant's Br. at 14, 29 (Aug. 30, 2021). Alternatively, Moses asks that we vacate all his convictions and order a new trial because the prosecutor committed prosecutorial misconduct. *Id.* at 14-15, 29.

//

//

**A. The Superior Court Did Not Err in Denying Moses's Motion for Judgment of Acquittal**

**1. Moses and the People offer different interpretations of the term "bodily injury" in Guam's First Degree CSC statute**

[22]    Under 9 GCA § 25.15(a)(6), First Degree CSC applies to conduct whereby "the actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration." 9 GCA § 25.15(a)(6) (2005). Personal injury is defined as "bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease or loss or impairment of a sexual or reproductive organ." 9 GCA § 25.10(a)(7) (2005).[3] Third Degree CSC includes sexual penetration in which any of the follow circumstances exists: it involves a person who is at least 14 years old and younger than 16 years old; force or coercion was used to accomplish the sexual penetration; or instances when the "actor knows or has reason to know that the victim is mentally defective,[4] mentally incapacitated or physically helpless." 9 GCA § 25.25(a)(1)-(3) (2005). As relevant here, then, the distinction between First and Third Degree CSC comes down to whether the actor caused personal injury to the victim in the course of the sexual penetration.

[23]    Moses argues the prosecution presented insufficient evidence to prove J.W. suffered bodily injury. *See* Appellant's Br. at 16. He notes that under 9 GCA § 16.10(b), which is part of Guam's criminal homicide statute, bodily injury is defined as "physical pain, illness, unconsciousness or any impairment of physical condition," and this definition has been incorporated into Title 9, Chapter 19, which criminalizes assault, reckless endangerment, and terrorizing offenses. Appellant's Br. at 16. Moses argues that because the Legislature declined to incorporate the definition of bodily injury in 9 GCA § 16.10(b) to the sexual offenses statute, and under the

---

[3] Because of recent amendments to the statute, the definition of "personal injury" is now found in 9 GCA § 25.10(a)(8) rather than in subsection (a)(7). *See* 9 GCA § 25.10(a)(8) (as amended by Guam Pub. L. 36-101:2 (June 15, 2022)).

[4] The Third Degree CSC statute was recently amended to change the term "mentally defective" to "mentally impaired." *See* 9 GCA § 25.25(a)(3) (as amended by P.L. 36:101:5 (June 15, 2022)).

principle of *ejusdem generis*, the prosecution had to prove injuries substantially greater than the ones in this case. *Id.* at 16-18. Moses recalls the evidence of J.W.'s physical injuries included scratches, bruising, and reported back pain. *Id.* at 17. Moses contends the prosecution was required to show proof of injuries that rose to "the level of disfigurement, chronic pain, pregnancy, disease, or loss or impairment of a sexual or [re]productive organ" but failed to do so. *Id.*

[24]     The People's argument relates to the statutory history and interpretation of 9 GCA Chapters 16 and 25, which deal with homicides and sexual offenses, respectively. *See* Appellee's Br. at 15-16 (Oct. 27, 2021). The People note that Guam Public Law 13-185 (Sept. 2, 1976) created several sections of the Guam Criminal Code, including Chapter 16, which defined "bodily injury" and "serious bodily injury." Appellee's Br. at 15. The definition of bodily injury and serious bodily injury from Public Law 13-185, they say, has not been amended since the law's passage. *Id.* Building on this argument, the People note that Chapter 25 as enacted in Public Law 13-185 "references 'serious bodily injury,' relates that definition to § 16.10 and makes no mention of 'bodily injury' or 'personal injury' regarding sexual offenses." *Id.* The People suggest that Public Law 15-060 (Aug. 31, 1979) amended several portions of the Guam Criminal Code, including Chapter 25, and included the term "bodily injury" in its definition for "personal injury." *Id.* The People ask the court to find that because the 15th Guam Legislature was aware of section 16.10(b)'s definition of "bodily injury" when it amended Chapter 25, "there was clear legislative intent to incorporate § 16.10(b)'s definition of bodily injury into Chapter 25's definition of personal injury." *See id.* at 16. The People also argue Moses's interpretation of bodily injury would require the court to interpret 9 GCA § 25.25 (a)(2), which creates a second-degree felony for the use of force or coercion to commit sexual penetration, as having "an inherent, unenumerated requirement for personal injury." *Id.* at 19.

[25]     We have no need to adjudicate this dispute today.  As explained below, we find the People provided sufficient evidence for a reasonable jury to find J.W. suffered from mental anguish. Accordingly, we reserve the question of how to interpret the precise definition of "bodily injury" as contemplated by 9 GCA § 25.10(a)(7) for a future case.  *See Hemlani v. Hemlani*, 2015 Guam 16 ¶ 33 ("As a general appellate principle, a court will not address issues unnecessary to the resolution of the case before it.").

### 2.  The evidence was sufficient to prove J.W. suffered mental anguish

[26]     Moving to the mental anguish argument, we start by noting Guam's CSC statutes were patterned on those from Michigan, and we have treated Michigan court decisions about this topic as persuasive authority.  *People v. Ehlert*, 2019 Guam 3 ¶ 20.  In *People v. Asevedo*, 551 N.W.2d 478, 481 (Mich. Ct. App. 1996) (per curiam), the Michigan Court of Appeals explained that bodily injury, mental anguish, and the other listed examples in the statute are different methods of finding personal injury.  The prosecution must prove only one of the listed examples in the statute to prove personal injury.  *Id.*

[27]     Moses argues that "being upset, crying, sobbing, hysterical and feeling anger or humiliation . . . would be expected to be present in just about any case of Third Degree Criminal Sexual Conduct."  Appellant's Br. at 17.  To elevate a charge from Third Degree to First Degree CSC, Moses argues the statute requires more stringent evidence of mental anguish.  *See id.* at 17-18.  He implies mental anguish was not proven because J.W. was not prescribed psychiatric medication, did not seek other psychiatric treatment, or leave her job as a response to the assault. *Id.*

[28]     The parties offer different interpretations of *People v. Petrella*, 380 N.W.2d 11 (Mich. 1985), a consolidated decision and a key Michigan case about proving mental anguish under the

First Degree CSC statute. *See* Appellee's Br. at 17; Appellant's Reply Br. at 3-5 9 (Nov. 3, 2021). The People argue the testimony from J.W., her partner, and the investigating officers who observed J.W. following the alleged assault is sufficient to prove mental anguish. *See* Appellee's Br. at 17-18. Moses highlights that the *Petrella* court came to different conclusions regarding sufficient proof of mental anguish in the two consolidated actions and urges that *Petrella* made "clear that a defendant has the right to appellate review of the mental anguish issue on a case by case basis." *See* Reply Br. at 3-5.

[29] Neither Michigan's nor Guam's legislature has defined "mental anguish." In *Petrella*, the Michigan Supreme Court defined mental anguish as "extreme or excruciating pain, distress, or suffering of the mind." 380 N.W.2d at 27. A prior Michigan Court of Appeals case had "reasoned that the Legislature must have intended that 'mental anguish' mean something more than the emotional distress experienced by the 'average' rape victim," because any victim of forcible sexual assault was presumed to suffer some mental anguish. *See id.* at 28. The Michigan Supreme Court rejected this interpretation, because "while virtually all rape victims may *in fact* suffer mental anguish, the prosecution is limited by the availability of probative, admissible, and credible *evidence* of such anguish" to distinguish First from Third Degree CSC. *Id.* (footnote omitted). The court said each sexual assault case must be decided on its own facts, but it provided a non-exhaustive list of factors that can support a finding of mental anguish; no single factor is dispositive. *Id.* at 28, 33. The factors include:

> (1) Testimony that the victim was upset, crying, sobbing, or hysterical during or after the assault.
>
> (2) The need by the victim for psychiatric or psychological care or treatment.
>
> (3) Some interference with the victim's ability to conduct a normal life, such as absence from the workplace.

(4) Fear for the victim's life or safety, or that of those near to her.

(5) Feelings of anger and humiliation by the victim.

(6) Evidence that the victim was prescribed some sort of medication to treat her anxiety, insomnia, or other symptoms.

(7) Evidence that the emotional or psychological effects of the assault were long-lasting.

(8) A lingering fear, anxiety, or apprehension about being in vulnerable situations in which the victim may be subject to another attack.

(9) The fact that the assailant was the victim's natural father.

*Id.* at 33.

[30]     The *Petrella* court applied these factors to the facts in the consolidated cases of *Petrella* and *People v. Simpson*. In *Petrella*, the victim testified that she was fearful during the assault, very upset afterwards, and cried after the assault. *Id.* She also testified that she missed three days of work immediately following the incident, and it caused her to periodically miss work. *Id.* at 34. She also suffered from insomnia and never again stayed in the apartment where she was raped. *Id.* The victim's friend testified that she was hysterical after the assault, and that the victim was not one to cry easily. *Id.* at 33-34. Based on this testimony, the court held a rational juror could find beyond a reasonable doubt that the prosecution proved mental anguish. *Id.* at 34.

[31]     In *Simpson*, the victim alleged her natural father sexually assaulted her. *Id.* She "testified that she was upset, screaming, and crying after the incident" and, on cross-examination, that she had probably cried during the incident. *Id.* She continued to cry and be upset when she returned home after the assault. *Id.* The lower courts inferred that the victim's emotional distress was aggravated because the defendant was her natural father. *Id.* The Michigan Supreme Court reversed in *Simpson* because there was no testimony or other evidence to support this proposition. *Id.* at 35.

[32]     The jury instructions in the instant case defined mental anguish as "extreme or excruciating pain, distress, or suffering of the mind" and then referenced the factors as identified in *Petrella*. *See* Record on Appeal ("RA"), tab 71 at 57 (Jury Instrs., Nov. 26, 2019).

[33]     This case is more akin to *Petrella* than *Simpson*. J.W. testified that she cried during the assault and feared Moses would kill her if she resisted his efforts. Chris and J.W.'s partner also testified that J.W. was crying and screaming after the incident. Officer Kim testified that he saw J.W. in the fetal position at GRMC and that she "appeared to be distraught." Tr. at 30-33 (Jury Trial, Nov. 21, 2019). Although there was no testimony about J.W. undergoing psychiatric therapy or receiving medication for anxiety or insomnia, this is not a dispositive factor. J.W. testified that she gets flashbacks of the assault, and J.W.'s partner testified that the assault harmed their relationship. A rational jury could find this testimony reflects the first, third, and seventh factors identified in *Petrella* as supporting a finding of mental anguish. The extensive testimony here contrasts with the unsupported inference the lower courts made in *Simpson*.

[34]     *Petrella* is persuasive authority for proving mental anguish under First Degree CSC, and the trial court acted appropriately in using the *Petrella* factors in the jury instructions. During appellate oral arguments, Moses's counsel emphasized there must be a clear distinction between First Degree and Third Degree CSC—namely, sufficient proof of personal injury—otherwise, prosecutors would have unfettered discretion to charge sexual crimes as First Degree. *See* Oral Arg. at 10:10:46-10:11:45 (Mar. 21, 2022). Moses's counsel also expressed concern that a prosecutor could simply check the boxes of one or more factors in *Petrella* to prove mental anguish. *See id.* at 10:27:08-10:27:30; 10:29:40-10:30:08. These concerns are valid. Like the court in *Petrella*, we emphasize that "each case must be decided on its own facts, and that no single factor," including psychological treatment or psychiatric medication, "should be seen as necessary

to a finding of mental anguish." *Petrella*, 380 N.W.2d at 33. There was more than sufficient evidence that J.W. suffered mental anguish and, by definition, personal injury under 9 GCA § 25.10(a)(7).

**B. The Superior Court Did Not Err in Denying Moses's Motion for a New Trial**

[35]    Moses argues the prosecutor committed prosecutorial misconduct. He claims the prosecutor improperly commented on his right to remain silent and not present evidence and appealed to juror sympathy by using allegedly inflammatory language to describe the sexual assault, among other allegedly improper statements. *See* Appellant's Br. at 20-26. In his written brief, Moses also argued the prosecutor committed misconduct by referring to his race at trial, *see* Appellant's Br. at 26-29, but, at appellate oral arguments, Moses's counsel withdrew this argument. Oral Arg. at 11:13:37-11:14:12. Thus, we will address only the remaining allegations of prosecutorial misconduct.

[36]    Moses compares this case to *People v. Cruz*, 2016 Guam 15. Appellant's Br. at 20-23. In *Cruz*, the prosecutor said that the People's evidence was uncontroverted, that there was no contradictory testimony, and that the evidence has not been rebutted. 2016 Guam 15 ¶¶ 23-24. We reversed Cruz's conviction and found that the prosecutor's statements violated Cruz's Fifth Amendment right against self-incrimination because they were extensive, and deferred curative instructions did not fully address the inference of guilt stressed to the jury. *See id.* ¶¶ 24, 25, 38. Moses asserts that like in *Cruz*, the prosecutor argued the evidence was uncontroverted. Appellant's Br. at 21-22.

[37]    Moses argues the following statement from the prosecutor during their rebuttal constituted improper burdenshifting:

> [T]here is absolutely no evidence in this trial that shows that. No evidence at all, okay? So the -- their version of events is completely unsupported by the evidence,

and do you remember what is part of the evidence? I asked [J.W.], "Did Mr. Morrison talk to you?"

"No." So what we have here is just not, like, some kind of, like, theory that's, like, out of nowhere. The theory that I am presenting to you is exactly what she said.

Tr. at 41 (Extract: Closing Args., Nov. 25, 2019); *see also* Appellant's Br. at 20-22.

[38]     Moses immediately moved for a mistrial after this statement, but the trial court instead issued a curative instruction about the People's burden of proof. The court reminded the jury that the People have the burden of proof and not to focus on whatever the People said the defense attorney did or failed to do. Moses argues the prosecutor then gave a "mixed message" that the People's version of the evidence was the only one before the jury, but that the People still had the burden of proof. Appellant's Br. at 22. Moses is referring to the following statement, which was made after the trial court's curative instruction: "So, ladies and gentlemen of the jury, so the version of the evidence as presented by the Government is the only version that needs to get (indiscernible 3:22:48), and that's because the People do have the only burden. Defense has no burden. It's all on the People." *Id.* at 43. According to Moses, these statements were problematic because he was the only person who could present contrary evidence because the CSC charges came down to whether the sex was consensual. Appellant's Br. at 22-23. He also argues the trial court's curative instruction did not remedy the People's indirect comment on his failure to testify or present evidence. *Id.* at 23.

[39]     The People argue Moses has taken the attorney's statements out of context, and the prosecutor's statements during her rebuttal were appropriate because some of the defense counsel's statements were not supported in the record. *See* Appellee's Br. at 20-27. This, the People argue, is unlike the prosecutor's misconduct in *Cruz*. *Id.* at 26. They claim the prosecutor's comments were directed at the defense counsel's arguments rather than insinuating that Moses

should have testified. *Id.* at 26-27 (citing *United States v. Bagley*, 772 F.2d 482, 495 (9th Cir. 1985)).

[40] In *Griffin v. California*, the U.S. Supreme Court held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. 609, 615 (1965). In a subsequent case involving an appeal based on the *Griffin* holding, the Supreme Court explained that the prosecutor's statements must be taken in context, and prosecutors may give a "fair response to a claim made by defendant or his counsel." *United States v. Robinson*, 485 U.S. 25, 32-33 (1988). Additionally, a defendant's silence does not create a blanket protection from the prosecutor attacking the defendant's theory of the case. *See United States v. Hasting*, 461 U.S. 499, 515 (1983) (Stevens, J., concurring) ("But I do not believe the protective shield of the Fifth Amendment should be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case."); *see also Cook v. Schriro*, 538 F.3d 1000, 1020 (9th Cir. 2008) ("Prosecutors may comment on the failure of the defense to produce evidence to support an affirmative defense so long as it does not directly comment on the defendant's failure to testify.").

[41] As the objection Moses raises here alleges a constitutional violation, we review the trial court's actions *de novo*. *Cruz*, 2016 Guam 15 ¶ 16. A "*Griffin* error is not a *per se* error requiring automatic reversal." *Id.* ¶ 21 (citing *Hasting*, 461 U.S. at 508). "Instead, 'a conviction should be affirmed if the reviewing court concludes that, on the whole record, the error was harmless beyond a reasonable doubt." *Id.* (quoting *Hasting*, 461 U.S. at 499). In the context of the current case, we must determine whether "absent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the [victim's] testimony, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict." *Id.* ¶ 22 (quoting Hasting, 461 U.S. at 501, 510-11). We consider

three factors to determine whether this type of error is harmless: "(1) the extent of the comments made; (2) whether an inference of guilt from silence was stressed to the jury; (3) the extent of other evidence suggesting the defendant's guilt." *Id.* (quoting *People v. Muritok*, 2003 Guam 21 ¶ 24).

[42]    This case is distinguishable from *Cruz*.  In *Cruz*, we explained that a prosecutor's indirect comments about a defendant's failure to testify can violate the defendant's Fifth Amendment right not to testify if the comments refer to the People's evidence as "'uncontradicted,' 'undenied,' 'unrebutted,' or 'undisputed,' when 'the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself.'" *Id.* ¶ 19 (quoting *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996)).  We also explained this right is violated only when "1) it was the prosecutor's manifest intention to refer to the defendant's silence, or 2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." *Id.* (quoting *Cotnam*, 88 F.3d at 497); *see also Bagley*, 772 F.2d at 494 (noting the same test).

[43]    During his closing argument in *Cruz*, the prosecutor said the victim gave "uncontroverted testimony" and that "there [was] no contradictory testimony that this happened." *Cruz*, 2016 Guam 15 ¶ 23 (alteration in original) (citation omitted).  The prosecutor also said the elements of Second Degree CSC were proved and "uncontroverted." *Id.* (citation omitted).  The prosecutor also claimed there was no evidence of any motivation for the victim to lie about the offense and argued the jury could draw an "implication" from Cruz's decision not to testify or offer contradictory testimony. *Id.* ¶¶ 23-24.

[44]    To properly contextualize the section of the prosecutor's statement that Moses provided in his brief, we must consider the statements the prosecutor made which prompted Moses's motion for a mistrial:

Mr. Morrison, for his whole closing argument rattled off all these questions and said, "No," "No," "No."

Well, the thing is that's not evidence, because he never actually asked her all of those questions, and when Mr. Morrison recites what the version of fact that happened that night, there is absolutely no evidence in this trial that shows that. No evidence at all, okay? So the -- their version of events is completely unsupported by the evidence, and do you remember what is part of the evidence? I asked [J.W.], "Did Mr. Morrison talk to you?"

"No." So what we have here is just not, like, some kind of . . . theory that's . . . out of nowhere. The theory that I am presenting to you is exactly what she said.

Tr. at 41 (Extract: Closing Args., Nov. 25, 2019).

[45] Following the trial court's curative instruction, the prosecutor then stated: "So, ladies and gentlemen of the jury, so the version of the evidence as presented by the Government is the only version that needs to get (indiscernible 3:22:48), and that's because the People do have the only burden. Defense has no burden. It's all on the People." *Id.* at 41-43.

[46] When viewed in context, we do not find the prosecutor's statements to be inappropriate. The prosecutor's statements that triggered Moses's motion for a new trial were the prosecution's response to defense counsel's characterization of J.W.'s testimony. During closing argument, defense counsel summarized J.W.'s testimony by asking several questions and responding "no" to each of them. *See* Tr. at 28-29 (Extract: Mots. & Closings, Nov. 25, 2019). During a sidebar with the judge, the prosecutor explained that the line about whether Mr. Morrison spoke to J.W. was a reference to her redirect examination of J.W. The prosecutor's explanation is supported by the record. During defense counsel's cross-examination of J.W., he asked J.W. how many times she had been to the Attorney General's office before trial. *See* Tr. at 60 (Jury Trial, Nov. 22, 2019). The first question that the prosecutor asked J.W. on redirect examination was: "Mr. Morrison asked if you've talked to me before and come to my office, right? . . . Has Mr. Morrison ever tried to talk to you?" *Id.* at 61.

[47]     The disputed statements from the prosecutor's rebuttal seem more like an attack against defense counsel's characterization of J.W.'s testimony rather than a manifest intention to reference Moses's failure to testify.  And the trial court immediately issued a curative instruction, which should have blunted the potential effect of any statement from the People that could be interpreted as improper burden-shifting.  Moses argues the prosecutor's statement after the curative instruction gave a mixed message about the prosecution's burden of proof.  Appellant's Br. at 22.  Upon examining these statements in context and in light of the relevant caselaw, we do not agree with this interpretation.  The prosecutor did not improperly stress Moses's failure to testify and present evidence at trial and therefore did not violate Moses's Fifth Amendment rights.

## C. The Prosecutor Did Not Commit Prosecutorial Misconduct by Using Vernacular Terms, and Moses's Substantial Rights Were Not Affected by any Golden Rule Violation

[48]     Moses's remaining arguments stem from the prosecutor's alleged use of improper vernacular and an alleged "golden rule" violation.

[49]     Moses argues that under *People v. Roby*, 2017 Guam 7, the prosecutor improperly appealed to juror sympathy by using emotionally charged vernacular terms such as "rape" to describe the alleged assault, and Mosese contends that "the warnings from *Roby* were completely ignored" here.  Appellant's Br. at 23-24.  The People used the term "rape" throughout the trial, most extensively during closing argument.  *See, e.g.*, Tr. at 19, 26 (Jury Trial, Nov. 21, 2019); Tr. at 63, 113 (Jury Trial, Nov. 22, 2019); Tr. at 6-8, 45-47 (Extract: Mots. & Closings, Nov. 25, 2019).  Moses argues the prosecutor's summation, during opening statement and closing argument, of J.W.'s testimony referencing oral sex was improper.  Appellant's Br. at 24.  For instance, during closing argument, the prosecutor referred to J.W.'s testimony and said, "But before that he asks, 'Do you eat?'  Which she took to mean, do I suck dick, right?"  Tr. at 5 (Extract: Mots. & Closings, Nov. 25, 2019).

**[50]**    Moses argues the prosecutor engaged in further misconduct by making an improper argument in which the prosecutor told the jurors they had to decide whether J.W. deserved to be raped. Appellant's Br. at 25. Moses also argues the prosecutor used the pronoun "you" to ask the jurors to put themselves in the victim's position. *Id.* at 25-26. Moses is referring to these parts of the prosecutor's closing argument:

> [J.W.] even told you, look this was all about the walk home, and she said she does— she does—sometimes she blames herself for walking home. But did she deserve this? That's up to you to decide. And if the criminal justice system has taught you anything in this case, if you come forward and you report that you've been raped, your whole life becomes (indiscernible: 2:57:32), whether you put the kids to sleep at a certain bedtime, or you're talking to your mom, whether you used a phone charger, whether you should have hailed a taxi home. All of that is put before 12 random strangers to question whether you have the character to claim that you were falsely raped.

Tr. at 26 (Extract: Closing Args., Nov. 25, 2019).

**[51]**    The People argue that the prosecutor's potentially inflammatory language was proper under *People v. Evaristo*, 1999 Guam 22, because the language was introduced via testimony. *See* Appellee's Br. at 27-28. Similarly, the People claim the prosecution's summation of J.W.'s reference to oral sex was an accurate summary of her testimony about the assault. *Id.* at 28. Thus, the People argue, these statements would relate to consent and were not calculated to inflame the passions of the jury. *Id.* The People claim the use of the word "you" and the prosecution's statements about the criminal justice system were not improper. *See id.* at 28-31. And the People say the question of whether J.W. deserved to be raped was meant to prevent jury nullification caused by the implicit bias that leads sexual assault victims to be blamed for putting themselves in dangerous situations. *See id.* at 28, 31-32.

//

//

### 1. Since Moses did not contemporaneously object to the prosecution's statements, our review is for plain error

[52]    The parties dispute whether Moses's argument about the prosecution appealing to juror sympathy is subject to harmless error or plain error review. The People say this issue is subject to plain error review because Moses did not contemporaneously object to the alleged inappropriate comments. *See* Appellee's Br. at 27; Oral Arg. at 10:55:54-10:58:49. Moses contends the issue was not "waived" because he objected with his Motion for a New Trial. *See* Reply Br. at 6-7.

[53]    To preserve a claim of prosecutorial misconduct for harmless error review, the defendant must object to the disputed conduct; the prosecutor's conduct is reviewed for plain error if the defendant did not object. *See Moses*, 2007 Guam 5 ¶¶ 7-8 ("Any comment objected to by defense counsel is subject to a harmless error standard, and will not be reversed unless it is more likely than not that the comment affected the jury's verdict. . . . Where defense counsel does not object to the conduct, then the standard of review is plain error." (citations omitted)).

[54]    In federal cases in which the defendant asserted the same argument that Moses advances—that filing a motion for a new trial serves as a contemporaneous objection—courts have rejected this argument and reviewed the claims of prosecutorial misconduct for plain error. *See, e.g.*, *United States v. Canty*, 37 F.4th 775, 790 (1st Cir. 2022). The purpose of the contemporaneous-objection rule is for the trial court to be able to timely rectify potential mistakes and avoid having to order a new trial. *United States v. Propst*, 959 F.3d 298, 303 (7th Cir. 2020); *United States v. Murphy*, 768 F.2d 1518, 1540 (7th Cir. 1985). Alleging prosecutorial misconduct for the first time in a motion for a new trial prevents the trial court from resolving a potential error that might have influenced the jury's verdict. In line with these federal cases, we review the remaining issues for plain error. Neither party disputes that the trial court's denial of Moses's motion for a new trial should be reviewed for an abuse of discretion.

## 2. The prosecutor's use of vernacular terms to describe the alleged assault did not amount to plain error

[55]     The *Evaristo* and *Roby* decisions provide the framework to evaluate Moses's arguments about the "golden rule" and use of inflammatory language.

[56]     In *Evaristo*, the defendant was convicted of using a knife to murder his wife. 1999 Guam 22 ¶¶ 1, 3-4. During closing arguments, the prosecutor used provocative language and invoked the so-called "golden rule," an argument in which the prosecutor asks the jurors to place themselves in the shoes of the party or victim. *Id.* ¶ 19. Invoking the golden rule is prohibited because it can taint the jurors' ability to view the evidence objectively. *Id.* At one point, the prosecutor asked the jurors to "imagine this knife being stuck into your wife." *Id.* This statement was subject to harmless error review because the defendant timely objected to the statement. *Id.* ¶¶ 18, 21. Though the prosecutor committed a golden rule violation, this court declined to overturn Evaristo's conviction because it was not convinced that the jury had not objectively reached their verdict. *Id.* ¶¶ 19, 21-22. In part, this was because after closing arguments, the trial court issued a curative instruction that instructed the jurors that attorneys' statements were not evidence. *Id.* ¶ 21. The defendant was acquitted of aggravated murder but found guilty of the less serious charge of murder. *Id.* ¶ 22. This court noted, "A verdict acquitting the defendant of some of the charges against him is 'indicative of the jury's ability to weigh the evidence without prejudice.'" *Id.* (quoting *United States v. Koon*, 34 F.3d 1416, 1446 (9th Cir. 1994), *rev'd in part on other grounds*, *Koon v. United States*, 518 U.S. 81 (1996)).

[57]     The prosecutor's other statements that led to the Evaristo's appeal were reviewed for plain error because Evaristo had failed to object. *See id.* ¶ 23. The prosecutor used graphic phrases to describe the evidence, including: "slashed," "gushing blood," and "stabbing the door with a knife." *Id.* ¶ 25. This court held the prosecutor did not commit error because these phrases were introduced

as evidence through witness testimony, and that even if there had been error, the defendant had not demonstrated that it was prejudicial. *Id.* ¶¶ 25-26.

[58]     In *Roby*, the defendant argued the prosecutor "engaged in a strategy to inflame the passions and prejudices of the jury" by using the term "gang rape" in their opening statement to describe the alleged crime. *Roby*, 2017 Guam 7 ¶ 31. When questioning witnesses, the prosecutor also described the acts as "rape, sexual assault, and sexual abuse," and attempted to elicit the same language from witnesses in their answers. *Id.* We determined the prosecution did not commit plain error but warned that the context and frequency of the use of vernacular terms are important considerations. *Id.* ¶¶ 35, 47 (citing *State v. Shabazz*, 48 P.3d 605, 625 (Haw. Ct. App. 2002)). We concluded this because although the term "gang rape" "risk[ed] unmooring jurors from their dispassionate task," it "was not frequently employed, was blunted by reciprocal defense use, and found support in the record." *Id.* ¶ 35. But we stressed the holding "is not to be read to mean that these terms or terms like them cannot ever contribute to a finding of prosecutorial misconduct. The People must use caution when employing vernacular that also shares legal meaning or is generally inflammatory and should avoid such terms where reasonably feasible." *Id.*

[59]     During her opening statement, closing argument, and rebuttal, the prosecutor extensively used vernacular terms to describe the sexual assault by Moses. *See, e.g.*, Tr. at 19 (Jury Trial, Nov. 21, 2019); Tr. at 6-8, 45-47 (Extract: Closing Args., Nov. 25, 2019). But the prosecutor's use of the term "rape" and the phrase "do I suck dick" was the near exact terminology that J.W. and other witnesses, including the expert witnesses who assisted J.W. at Healing Hearts, used to describe the assault. *See, e.g.*, Tr. at 88, 110-112, 130 (Jury Trial, Nov. 21, 2019); Tr. at 37, 92 (Jury Trial, Nov. 22, 2019), Tr. at 5-6 (Extract: Closing Args. Nov. 25, 2019). Like in *Evaristo*, these terms were introduced as evidence during testimony rather than the prosecutor introducing the terms

with no basis in evidence. *See Evaristo*, 1999 Guam 22 ¶ 25. Thus, we agree with the trial court that it was not "reasonably feasible" to avoid using the term "rape." RA, tab 91 at 4 (Dec. & Order, Apr. 8, 2020). As for the phrase "do I suck dick," it was a direct quote from testimony, so the prosecutor did not commit misconduct by incorporating the phrase in her closing arguments.

[60]    Moses says, "The term 'rape' has no legal significance on Guam. It is however an upsetting and emotionally charged term that people are likely to react to in a negative way." Appellant's Br. at 24. In an appeal from the former District Court of Guam Appellate Division, the Ninth Circuit rejected similar arguments that the prosecutor's use of the term "rape" automatically constitutes prosecutorial misconduct. *See People v. Torre*, 68 F.3d 1177, 1179-80 (9th Cir. 1995). The court explained:

> The term "rape" is the common English word for the conduct charged in Guam as "first-degree criminal sexual conduct." . . . [W]hen the prosecutor has obtained an indictment charging the defendant with a crime, and has in his opening statement told the jury that the defendant will be proved guilty of that crime, and has offered evidence that the crime did in fact occur, there is no rule of evidence or ethics that forbids the prosecutor from referring to the crime by its common name when examining a witness. There is no rule requiring the prosecutor to use a euphemism for it or preface it by the word "alleged." No objection to the prosecutor's vocabulary would have been properly sustained.

*Id.* at 1180. Other jurisdictions likewise do not view a prosecutor's use of the word "rape" to qualify as misconduct. *See, e.g.*, *People v. Pernell*, 414 P.3d 1, 14, *aff'd on other grounds*, 411 P.3d 669 (Colo. App. 2014) (finding no error in prosecutor's use of term "rape" during opening statement or closing argument).

[61]    Even if the prosecutor's word choice constituted an error, we are not persuaded that Moses's substantial rights were affected and that reversal is necessary to prevent a miscarriage of justice—the third and fourth prong of plain error review. Moses fails to explain how there is "'a reasonable probability' that but for the claimed error the result of the proceeding would have been

different," *Lessard*, 2019 Guam 10 ¶ 16 (quoting *Taisacan*, 2018 Guam 23 ¶ 37), and "'that it is reasonably probable that a result more favorable to [him] would have been reached in the absence of the error,'" *People v. Aguirre*, 2004 Guam 21 ¶ 29 (quoting *People v. Watson*, 299 P.2d 243, 254 (Cal. 1956) (in bank)). Although the prosecutor did not commit prosecutorial misconduct by using vernacular terms, we reiterate that the People must exercise caution when using vernacular terms that could unmoor the jurors from objectively evaluating the evidence.

### 3. Moses's substantial rights were not affected by the alleged golden rule violation

[62] This case presents a borderline golden rule violation. Invoking the golden rule is a prohibited tactic. *Evaristo*, 1999 Guam 22 ¶ 19; *People v. Cepeda*, 2021 Guam 9 ¶ 53; *see also Holliman v. State*, 79 So. 3d 496, 500 (Miss. 2011) (reversing defendant's conviction because prosecutor asked jurors to imagine a shotgun being pointed in their face like the murder victim).

[63] Unlike in *Evaristo*, the prosecutor did not explicitly ask the jurors to imagine a close family member or themselves being assaulted like J.W. However, asking the jury to question whether J.W. deserved to be raped as well as asking them to consider what the criminal justice system has taught them with respect to CSC cases raises objectivity concerns. *See Evaristo*, 1999 Guam 22 ¶ 19 ("[T]he jurors [sic] ability to objectively exercise their duty to weigh the evidence may be compromised."). But even if we agreed with the trial court that the prosecutor violated the golden rule with either or both of the above statements, Moses fails to satisfy the third prong of plain error review.

[64] Moses has the burden of showing the error affected his substantial rights, meaning the error was prejudicial and affected the outcome of his case. *See People v. Fegarido*, 2014 Guam 29 ¶ 43. A golden-rule-violation analysis evaluates "whether the People's [erroneous] comment was used in such a way that the conviction was based upon passion, bias or sympathy, rather than

impartially." *Evaristo*, 1999 Guam 22 ¶ 19. The factors we consider include the full context of the record, whether the defendant objected to the arguments, and whether the judge instructed the jury to disregard the comments or reminded the jurors that the attorney's comments are not evidence. *Cepeda*, 2021 Guam 9 ¶ 53.

[65]     Thus, the comment about whether J.W. deserved to be raped must be examined in the entire context of the case. This case boiled down to whether the jurors believed the testimony of J.W. and the supporting witnesses, or Moses's argument that they had consensual sex. J.W. testified that Moses raped her and that she sometimes blames herself for walking home the night of the alleged assault. When viewed in this context, the statement about whether J.W. deserved to be raped is less venomous. As a means of comparison, we also note *Evaristo* involved an explicit and graphic violation of the golden rule—asking the jurors to imagine a knife going in their wife— and we declined to reverse the conviction. *See Evaristo*, 1999 Guam 22 ¶¶ 19, 21.

[66]     Similarly, the prosecutor's other comments do not rise to reversible error. Though she used the second person and potentially invited the jury to put themselves in the victim's shoes, her argument was strictly focused on what occurred at trial. Part of Moses's defense strategy was to attack the credibility of J.W. *See* Tr. at 25-27 (Jury Trial, Nov. 21, 2019) (showing defense counsel's theory of the case was, in part, that the sex between J.W. and Moses was consensual, a direct contradiction to J.W.'s testimony). The prosecutor's comments were calling the jury's attention to that testimony and asking them to consider if J.W. should be deemed credible. As such, there was at least a basis in the evidence for this type of argument.

[67]     Moses did not object to either of the prosecutor's comments. The trial court read the jury instructions after closing arguments and reminded the jurors that anything the lawyers said was not part of the evidence. Moses was acquitted of theft, though a less-serious offense, which would

support the proposition that the jury analyzed the evidence without prejudice. *See Evaristo*, 1999 Guam 22 ¶ 22. Under *People v. Cepeda*, 2021 Guam 9, and *Evaristo*, each of these facts weigh against a finding that the alleged golden rule violation warrants reversal. *See Cepeda*, 2021 Guam 9 ¶ 53; *Evaristo*, 1999 Guam 22 ¶ 22. Thus, Moses fails to prove how the border-line golden rule violation affected his substantial rights.

## V. CONCLUSION

[68]    We hold there was sufficient evidence to support Moses's conviction of First Degree CSC based on a finding of mental anguish. Moses failed to show the prosecutor violated his Fifth Amendment rights by indirectly bringing attention to his failure to testify and present evidence at trial. We find no error in the prosecutor's use of vernacular terms to describe the alleged sexual assault. Whether the prosecutor committed a golden rule violation is a closer call, but Moses fails to show how his substantial rights were affected by the alleged violation. The trial court therefore did not abuse its discretion by denying Moses's motion for a new trial.

[69]    We **AFFIRM** the judgment of conviction.


/s/
ROBERT J. TORRES
Associate Justice

/s/
KATHERINE A. MARAMAN
Associate Justice


/s/
F. PHILIP CARBULLIDO
Chief Justice